IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NTR BULLION GROUP, LLC, | § | |
| | § | |
| Plaintiff-Counterdefendant, | § | |
| | § | Civil Action No. 3:13-CV-3945-D |
| VS. | § | |
| | § | |
| LIBERTY METALS GROUP, LLC, | § | |
| | § | |
| Defendant-Counterplaintiff-<br>Third-Party Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| JOHN M. LONNEKER, | § | |
| | § | |
| Defendant, | § | |
| | § | |
| VS. | § | |
| | § | |
| DOUGLAS JACKSON, | § | |
| | § | |
| Third-Party Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff-counterdefendant NTR Bullion Group, LLC ("NTR") and third-party defendant Douglas Jackson ("Jackson") move under Fed. R. Civ. P. 12(b)(6) to dismiss the first amended counterclaim and third-party claim of defendant-counterplaintiff-third-party plaintiff Liberty Metals Group, LLC ("Liberty"). Liberty asserts claims that rest on the premise that NTR and Jackson violated the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"). Applying their motion to Liberty's second amended counterclaim and third-party

claim,[1] the court grants the motion, but it also grants Liberty leave to replead.

I

Liberty alleges that NTR solicited it to enter into contracts for the sale of various commodities for future delivery, including gold and silver. In support of this allegation, Liberty alleges that neither Liberty nor NTR ever intended for commodities to be delivered in connection with the alleged contracts, and that neither Liberty nor NTR ever delivered, or

---

[1]The January 6, 2014 motion to dismiss of NTR and Jackson is addressed to Liberty's *first* amended answer, counterclaim, and third-party claim, but the court can decide the motion to dismiss as if it were addressed to Liberty's *second* amended answer, counterclaim, and third-party claim, filed on January 14, 2014.

NTR and Jackson filed their motion to dismiss on January 6, 2014, and the motion is addressed to Liberty's *first* amended answer, counterclaim, and third-party claim filed on November 4, 2013. After NTR and Jackson filed their motion, NTR filed a first amended complaint on January 7, 2014, and Liberty filed on January 14, 2014 a second amended answer, counterclaim, and third-party claim. Although the January 6, 2014 motion to dismiss of NTR and Jackson is addressed to Liberty's *first* amended answer, counterclaim, and third-party claim, which has been superseded, and although this court typically denies as moot a motion to dismiss that is addressed to a superseded pleading, the court can decide the January 6, 2014 motion to dismiss as if it were addressed to Liberty's *second* amended answer, counterclaim, and third-party claim, filed on January 14, 2014.

This court has recognized that it can treat a motion to dismiss directed to a superseded pleading as if it were addressed to the amended pleading where the defects in the superseded pleading reappear in the amended pleading. *See Holmes v. Nat'l Football League*, 939 F. Supp. 517, 523 n.7 (N.D. Tex. 1996) (Fitzwater, J.) ("[T]he court may nevertheless treat defendant['s] motion as directed to the amended complaint because the defects in [plaintiff's] complaint reappear in the amended complaint."); *see also Patton Elec. Co. v. Rampart Air, Inc.*, 777 F. Supp. 704, 713 (N.D. Ind. 1991) ("'If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.'") (quoting 6 Charles A. Wright, et al., *Federal Practice and Procedure* § 1476, at 556-58 (2d ed. 1990)). Apart from a handful of editorial changes, Liberty's first and second amended answers, counterclaims, and third-party claims are identical. Accordingly, the court will treat the instant motion as if it were directed to Liberty's *second* amended answer, counterclaim, and third-party claim filed on January 14, 2014.

demanded delivery of, commodities in connection with them. Liberty asserts that, on two occasions, NTR demanded cash payments to cover trading losses related to these contracts. And Liberty avers that NTR unilaterally applied other payments that it made for the purchase of bullion to cover other trading losses. NTR and Jackson move to dismiss under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

II

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the counterclaim and third-party claim] by accepting all well-pleaded facts as true, viewing them in the light most favorable to [the party asserting the claim]." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)) (internal quotation marks and one alteration omitted; other alterations added). To survive a motion to dismiss under Rule 12(b)(6), the party asserting the claim must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the [party asserting the claim] pleads factual content that allows the court to draw the reasonable inference that the [party against whom the claim is asserted] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alterations added). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the [pleading] has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)) (two alterations added; one alteration omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

### III

### A

The CEA applies to "swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). It does not apply to "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 1a(27); *see also* 17 C.F.R. § 1.3(o) (2013) (stating that term "[f]uture delivery" "does not include any sale of a cash commodity for deferred shipment or deliver"). Courts have therefore long recognized that the latter kinds of contracts, "commonly known as 'cash forward contracts[,]' . . . are exempt from regulation under the CEA." *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 786 (7th Cir. 1999) (citing *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998), and *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 576-77 (9th Cir. 1982)).

Futures contracts and cash forward contracts[2] are similar in that they both create a binding obligation on the parties to deliver and accept delivery of a specified commodity in

---

[2]"The terms 'futures contracts' and 'cash forward contracts' are terms of art which do not appear in the [CEA]." *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 n.4 (9th Cir. 1995).

the future.³ But they are different in that parties who enter into futures contracts do not contemplate or intend actual delivery,⁴ while parties who enter cash forward contracts have "a legitimate expectation that physical delivery . . . will occur in the future." *CFTC v. Midland Rare Coin Exch., Inc.*, 71 F.Supp.2d 1257, 1262 (S.D. Fla. 1999) (quoting *Andersons*, 166 F.3d at 318).⁵ Thus under *Midland Rare Coin* and cases applying similar reasoning, futures contracts and cash forward contracts are distinguished by determining whether, at the time the contract is entered into, both parties have a legitimate expectation that physical delivery of the actual commodity will occur in the future. *See, e.g., CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995) (stating that CEA's exclusion of

---

³In practice, futures contracts are rarely completed through delivery of the commodity. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 674 (7th Cir. 2009); *see also Moody v. Comm'r*, 49 T.C.M. (CCH) 514, 514 (T.C. 1985) (estimating that 1% to 3% of futures contracts result in actual delivery). This does not change the fact that a futures contract is a real and binding contract to deliver and accept delivery of a commodity, and that the parties may offer or demand delivery on the basis of the contract. *See Kohen*, 571 F.3d at 674.

⁴To ensure against having to deliver or take delivery, participants in the futures markets usually sign a standardized contract directly with a commodities exchange clearinghouse rather than with an individual counter-party. These clearinghouses are parties to myriad contracts maturing daily, and in all but the rarest cases, they can arrange to offset competing obligations. *See* James M. Falvey & Andrew N. Kleit, *Commodity Exchanges and Antitrust*, 4 Berkeley Bus. L.J. 123, 127 (2007).

⁵NTR and Jackson argue that the court should apply *CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004), in determining whether Liberty has plausibly alleged that Liberty entered into futures contracts with NTR. Liberty responds that the court should apply *Midland Rare Coin*. Because the result would be the same under either standard, the court does not decide whether *Zelener* or *Midland Rare Coin* is more persuasive. Instead, for purposes of this decision, the court assumes that *Midland Rare Coin* should control, and it applies it accordingly. *But cf. CFTC v. UForex Consulting, LLC*, 551 F.Supp.2d 513, 529-37 (W.D. La. 2008) (considering *Zelener* and line of cases including *Midland Rare Coin*, and holding that *Zelener* should apply).


cash forward contracts "is predicated on both parties contemplating and intending future delivery of the actual commodity"); *see also* Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options, 50 Fed. Reg. 39,656, 39,657 (Sept. 30, 1985) (stating that cash forward contract "must be a binding agreement on both parties").

Section 742(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified as amended at 7 U.S.C. § 2(c)(2)(D)), amended 7 U.S.C. § 2(c)(2) to make the CEA applicable to certain kinds of leveraged retail commodity agreements, contracts, and transactions, even if the agreements, contracts, or transactions are not futures contracts. *See* 7 U.S.C. § 2(c)(2)(D)(iii) (stating that the enforcement provisions at §§ 6(a), 6(b), and 6b apply "to any agreement, contract, or transaction described in clause (i), *as if* the agreement, contract, or transaction was a contract of sale of a commodity for future delivery") (emphasis added); *see also CFTC v. Hunter Wise Commodities, LLC*, ___F.3d___, 2014 WL 1424435, at *1 (11th Cir. Apr. 15, 2014) (holding that § 2(c)(2)(D) actually expands the CFTC's enforcement authority). Section 2(c)(2)(D) does not apply to "a contract of sale that . . . creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer." § 2(c)(2)(D)(ii)(III)(bb). Neither the statute nor subsequent regulatory interpretations have clarified whether the cash forward contract exclusion applies to § 2(c)(2)(D).

B

Even when a party asserting a claim under the CEA alleges that it did not legitimately expect that physical delivery of the actual commodity would occur in the future, the party cannot state a plausible claim without alleging some facts that enable the court to draw various reasonable inferences regarding the subjective expectations of the other contracting party.  In the present case, for example, if Liberty knew that NTR intended the alleged contracts to be cash forward contracts, while NTR *did not* know that Liberty intended them to be futures contracts, the alleged contracts might only be enforceable as cash forward contracts despite Liberty's expectations.  *See, e.g.,* Restatement (Second) of Contracts § 20(2) (1981) (explaining effect of misunderstanding on the manifestation of mutual assent required to form contract).  Or, if NTR intended the alleged contracts to be cash forward contracts, but NTR did not know that Liberty intended them to be futures contracts, the alleged contracts might not be contracts at all.  *See, e.g., id.* § 20(1).  Moreover, Liberty must plead sufficient facts to permit the court to draw the reasonable inference that NTR met the relevant *scienter* requirement.  *See, e.g., CFTC v. King*, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (Lynn, J.) (explaining that § 4b(a)(2)(i)-(iii) of the CEA, codified at 7 U.S.C. § 6b, requires that plaintiff show that defendant knew or should have known that conduct would mislead plaintiff); *cf., e.g., Rountree v. Smith*, 108 U.S. 269, 275-76 (1883) (finding no evidence that defendant intended to enter futures contracts, thus upholding lower court's refusal to award damages to party who intended contracts to be futures contracts, in violation of state gambling law); *Jacobs v. Hyman*, 286 F. 346, 348-49 (5th Cir. 1923) (citing federal

cases for proposition that party who intended to enter futures contract in violation of state gambling law could not invalidate contract when counter-party intended to enter cash forward contract).

IV

The court holds that Liberty has failed to state a plausible claim for relief under the CEA. Many of Liberty's allegations are wholly conclusory, amounting to nothing more than repeated allegations that Liberty and NTR entered into contracts, and that they were futures contracts, not cash forward contracts. *See* 2d Am. Countercl. ¶¶ 46, 48, and 53. Liberty also asserts that neither party intended the contracts to result in the actual delivery of commodities. *See id.* ¶ 48. Even assuming that this plausibly addresses Liberty's own intentions,[6] it is conclusory regarding NTR's expectations at the time NTR entered into the alleged contracts.

Liberty argues that neither it nor NTR ever demanded delivery, made arrangements for delivery, or demonstrated any intent to make or receive delivery pursuant to the alleged contracts that are the subject of its counterclaim and third-party claim. *See id.* Liberty does

---

[6]There are reasons to question this allegation. For example, Liberty admits that both it and NTR have been active participants in the precious metals market, and that they have contracted for, and completed delivery of, precious metals in the past. *Compare* 2d Am. Countercl. ¶¶ 10 and 13 (admitting allegations in NTR's state court complaint), *with Lachmund*, 191 F.3d at 788 (considering parties past participation in commodities markets). Liberty also fails to attach to its pleading, or to allege any details about, the alleged contracts in question, even though this is often some of the best evidence that a contract is a futures contract. *Cf. id.* at 788-89 (explaining how contract terms can strengthen argument that contract was futures contract).

not allege that the specified dates for delivery in the alleged contracts have expired. If the delivery dates under the alleged contracts are yet forthcoming, these allegations do not permit a reasonable inference that the contracts are futures contracts as opposed to cash forward contracts.

Liberty argues that neither party was capable of offering or taking delivery. *See id.* ¶ 53. This contention is contradicted by other allegations that Liberty makes, such as that it is a precious metals dealer, that NTR is a market-maker for precious metals, and that Liberty has ordered and taken possession of precious metals from NTR in the past. *See id.* ¶¶ 10 and 13 (admitting allegations in NTR's state court complaint). Because Liberty does not explain why NTR and Liberty were able to make and take delivery in the past, but were unable to do so at the time the alleged contracts matured, this allegation undermines the plausibility of Liberty's CEA claim.[7]

*Midland Rare Coin* identifies several factors that can help distinguish a futures contract from a cash forward contract, including:

---

[7]The court need not decide whether the cash forward contract exclusion applies to § 2(c)(2)(D) because Liberty's allegation that it does not fall under the express exclusion at § 2(c)(2)(D)(ii)(III)(bb) is wholly conclusory and is rendered implausible by the admissions mentioned above. *Cf. CFTC v. Hunter Wise Commodities, LLC*, 2013 WL 718503, at *5-7 & *7 n. 24 (S.D. Fla. Feb. 26, 2013) (holding that company that hired telemarketers to sell leveraged commodity deals to consumers with no experience in the commodities market, that never delivered any commodities to consumers, and that itself had never taken delivery of any commodities, did not fall under subsection (bb) exclusion), *aff'd*, ___ F.3d ___ , 2014 WL 1424435 (11th Cir. Apr 15, 2014).

> (1) whether the seller of the contracts entered into these contracts only with producers and not with speculators from the general public; (2) whether the buyers and sellers had the ability to take or make delivery on the contracts; (3) whether the seller relied on actual delivery of the commodity to carry out its business; (4) whether the contracts were clearly tools to accomplish the actual delivery of the commodity in exchange for money; (5) whether delivery and payment routinely occurred between the parties in past dealings; and (6) whether the seller received cash payment on the contracts only upon delivery of the actual commodity.

*Midland Rare Coin*, 71 F.Supp.2d at 1262 (citing *Andersons*, 166 F.3d at 320). Applying these factors confirms that Liberty's pleading fails to plead a plausible claim for relief under the CEA. Liberty's admissions tend to show that, according to factors (2), (3), and (5), its alleged contracts with NTR were cash forward contracts. *See* 2d Am. Countercl. ¶¶ 10 and 13 (admitting that Liberty is a precious metals dealer, that NTR is a market-maker for precious metals, and that Liberty has ordered and taken possession of precious metals from NTR in the past). Liberty fails to allege any facts that, according to factors (1), (4), or (6), would tend to show that its alleged contracts were futures contracts.

V

Plaintiffs move to dismiss Liberty's remaining claims for declaratory judgment, for breach of fiduciary duty, and for aiding and abetting liability under the CEA. Liberty alleges that its CEA and declaratory judgment claims are not entirely duplicative, and that it has stated a plausible claim that NTR breached a fiduciary duty to Liberty. But after excluding Liberty's claims based on NTR's alleged violations of the CEA, Liberty's remaining allegations—that NTR encouraged Liberty to enter into unspecified transactions, that NTR

acted as broker, and that NTR paid Liberty money—do not plausibly allege a right to the types of relief specified. And because Liberty's CEA claims against NTR fail, Liberty's claim that Jackson aided and abetted NTR in violating the CEA fails as a matter of law.

VI

Although the court is granting the motion to dismiss, it will allow Liberty to replead. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). Because Liberty has not stated that it cannot, or is unwilling to, cure the defects that the court has identified, the court grants Liberty 28 days from the date this memorandum opinion and order to file a third amended answer, counterclaim, and third-party claim.

\* \* \*

For the reasons explained, the court grants the motion of NTR and Jackson to dismiss

Liberty's second amended answer, counterclaim, and third-party claim, and it also grants Liberty leave to replead.

**SO ORDERED**.

April 18, 2014.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE